[Nos. 18107-0-II; 18108-8-II.   Division Two.   July 12, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES LEVENE JACKSON, JR., *Appellant.*

THE STATE OF WASHINGTON, *Respondent*, v. HELEN VIRGINIA JACKSON, *Appellant.*

*Thad E. Scudder* and *Eleanor M. Couto*, for appellants.
*James J. Stonier, Prosecuting Attorney*, and *Jill M. Johanson, Deputy*, for respondent.

MORGAN, J. — James Levene Jackson, Jr., appeals his conviction for possession of methamphetamine with intent to deliver. Helen Virginia Jackson, his wife, appeals her conviction for possession of methamphetamine. We affirm both convictions.

In December 1993, Andrew Hamilton was employed as a police officer for the City of Kelso. On December 10,[1] according to his later affidavit for a search warrant, he

was contacted by Chief Tony Stoutt (Kelso Police Department) who advised that he had been contacted earlier in the day by an individual who has given him large amounts of information in the past. Chief Stoutt also advised that this informant has given information in the past which has led to the arrest of individuals for felony offenses. Chief Stoutt advised that the individual was always very cautious about giving information. Normally, he would only give it by phone and directly to Chief Stoutt, and would not deal with anyone else. Chief Stoutt advised that the information he was given was that a James Jackson, who is a manager of the trailer court at 151 Cowlitz Gardens and resides in Space #11, is receiving crank through Federal Express on either Saturdays or Mondays; and that, every Thursday, he express-mails a package from the Longview Post Office to an individual named Dan in California. Chief Stoutt was advised that James is selling teeners for $125 each, and that he was selling to a large number of people in the park, and that he goes through an ounce or two of crank per week.

Chief Stoutt advised that, from the information he was given, James is 42 years old, an ex-biker, 6'4", 220 pounds, with tattoos all over his body. He is an ex-Weyerhaueser employee who was fired after he failed a urinalysis. Chief Stoutt was advised that the suspect always wears bib overalls and was not very hard to recognize, due to the tattoos. H[is] wife . . . is named Helen . . . . [2]

---

[1]The record is unclear on whether the date was December 1 or December 10. Compare Report of Proceedings at 9, line 10, with ex. 1, page 7, line 5. We assume the date was December 10.

[2]Ex. 1, page 7.

Stoutt did not give Hamilton the informant's name.

After receiving this information, Hamilton verified that Jackson lived at the stated address. He also made several attempts to contact Federal Express' security division, which was "back east somewhere," but "had no luck."[3]

On the morning of December 30, according to Hamilton's later affidavit, he stopped a Federal Express truck on its route and asked the driver if she had ever made any deliveries to the Cowlitz Gardens area. She advised that she was not the Kelso driver, and that she would have the Kelso driver contact him. Approximately an hour later, he received a call from a Federal Express employee advising that there was a parcel on the Kelso truck that matched the description Hamilton had given.[4] The employee said the package was addressed to James Jackson at 151 Cowlitz Gardens, Space 11. Hamilton said he planned "to do a warrant and would want the package," and the employee said "he would get back to [Hamilton] later that day."[5] The employee also gave Hamilton a direct phone number for Federal Express' security division.

Hamilton called the security division again, and this time reached a man who worked there. According to Hamilton's later affidavit, he said he "would be obtaining a search warrant for the parcel," and Federal Express said "the package would be delivered to the Cowlitz County Sheriff's Office."[6]

About 10 a.m. the same day, Federal Express delivered the package to a clerk at the front counter of the sheriff's office. Hamilton was not present at the time, but he was notified and arrived about 11:30 a.m. He arranged for a trained drug detection dog to be brought in, and about

[3]Report of Proceedings at 12.

[4]Ex. 1, page 11.

[5]Report of Proceedings at 13.

[6]Ex. 1, page 11.

11:45 a.m. the dog alerted on the package.[7] Hamilton also observed that the package bore a return address of 282 Kansas, San Francisco, CA 94107. He contacted a postal inspector, and that person quickly ascertained that the return address was fictitious. He then obtained a search warrant, and the package was opened. The time, according to Hamilton, was about 2 p.m. The package contained 16.7 grams of methamphetamine.

After the package had been opened and its contents inspected, it was resealed and sprayed with a substance discernible under ultraviolet light. Then, a police officer posing as a Federal Express employee delivered it to the Jacksons' address.

A few minutes later, officers served a search warrant on the Jacksons' residence. They found James Jackson inside, and they stopped Helen Jackson as she was leaving. According to evidence later adduced on pre-trial motions or at trial, they found the methamphetamine in a drain pipe for the toilet, and the Federal Express package outside the bathroom. They found "a black fanny pack containing a syringe and Helen Jackson's wallet with identification, a black shaving kit with 4 syringes, and $780.00 in cas[h]."[8] They found a receipt for a $300 money order, with Helen Jackson as payor and one Danny Orlando as payee, and an envelope from Helen Jackson to Danny Orlando at a San Francisco address. While in the house, the officers "answered several telephone calls from callers seeking to purchase drugs, and who wanted to speak directly with Helen or James Jackson."[9] The substance discernible under ultraviolet light was on James Jackson's hands, and Helen Jackson admitted injecting methamphetamine earlier that day.

---

[7]The dog was exposed to the package in two different ways. Initially, the package was placed in a line with three dummy packages. After the dog had alerted to it, the package was placed under a chair, and the dummy packages were placed at other locations within the same room. Again, the dog alerted to the suspect package.

[8]Clerk's Papers (Helen Jackson) at 7.

[9]Clerk's Papers (Helen Jackson) at 7.

On January 6, 1994, the State charged both Jacksons with one count of possession of methamphetamine with intent to deliver. Each defendant filed a motion to suppress, and a pretrial hearing was held at which Hamilton was the only witness. According to Hamilton's testimony, he had never directed or requested Federal Express to deliver the package to the sheriff's office; rather, he had intended to secure a search warrant that he would execute at the offices of Federal Express.[10] According to inferences argued by the prosecutor, Federal Express had delivered the package to the front counter of the sheriff's office because they had "want[ed] to get rid of it," and not "be an unwitting participant in the trafficking of narcotics."[11]

Accepting the State's view of the facts, the trial court found in part:

> That on December 30, 1993, Federal Express responding to Detective Hamilton's interest in the package, delivered the package to the Cowlitz County Sheriff's Office, who in turn delivered it to the task force office. Detective Hamilton did not direct or request that the package be delivered to the Sheriff's office, but expressed an interest in the package. Detective Hamilton informed Federal Express that he would seek to obtain a search warrant, and they informed him that they would deliver it to the Sheriff's Office.[12]

The trial court concluded that the "delivery of the pack-

---

[10]Under questioning from the prosecutor, Hamilton testified:

Q: Had you instructed the Federal Express to deliver it there [to the sheriff's office]?

A: No, I had not. I had originally told them that's where I would have it delivered, but there was a never "Would you please bring me the package," or anything between me and the Federal Express security office.

Q: Were you attempting, then, to serve a warrant on the Federal Express, was that your intent?

A: Yes, that was my intent.

Report of Proceedings at 13, 21.

[11]Report of Proceedings at 21.

[12]Clerk's Papers (Helen Jackson) at 11.

age by Federal Express to the task force office, and the elapsing of less than four hours from delivery to the execution of the search warrant, was a minimal intrusion and reasonable under the circumstances."[13] Consequently, it denied the motions to suppress.

Before trial, Helen Jackson also filed a *Knapstad*[14] motion in which she asserted that the State lacked evidence sufficient to prove a case against her. The trial court denied the motion.

On March 9, 1994, James Jackson stipulated in open court to facts sufficient to prove possession of methamphetamine with intent to deliver. He was found guilty and sentenced to a standard range prison term of 30 months.

Also on March 9, the State reduced the charge against Helen Jackson to possession of methamphetamine. She then stipulated, in open court, to the elements of that crime. The trial court found her guilty and imposed a standard range term of 45 days in the county jail, with 30 days converted to community service.

On appeal, both Jacksons argue the trial court erred by denying their motions to suppress. Helen Jackson also argues the trial court erred by denying her *Knapstad* motion. We consider each argument separately.

## I.

■ Turning to the motions to suppress, we preliminarily examine the parties' respective burdens of proof. Generally, a defendant must show that he or she is entitled to constitutional protection.[15] This includes the burden of

---

[13]Clerk's Papers (Helen Jackson) at 12-13.

[14]*State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

[15]*United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994). The *Carhee* court stated that the defendant:

> bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he or his luggage was "seized"). The government then bears the burden of proving that its warrantless actions were justified (i.e., as a lawful investigatory stop, or under some other excep-

showing that a privacy or possessory interest was invaded,[16] that government agents participated in the invasion,[17] and that the defendant has standing, automatic or otherwise, to contest the invasion.[18]

Once a defendant shows that he or she is entitled to constitutional protection, the parties' burdens vary according to whether the State acted with a warrant. If it did not, it must show justification for its actions.[19] If it did,

tion to the warrant requirement). Generally, "if the search or seizure was pursuant to a warrant, the defendant has the burden of proof."

*Carhee*, 27 F.3d at 1496 (citations omitted).

[16]*United States v. Singleton*, 987 F.2d 1444, 1447 (9th Cir. 1993); *United States v. Hoey*, 983 F.2d 890, 892 (8th Cir. 1993); *United States v. Monie*, 907 F.2d 793, 794 (8th Cir. 1990); *State v. Kealey*, 80 Wn. App. 162, 168, 907 P.2d 319 (1995), *review denied*, 129 Wn.2d 1021 (1996); *see also Soldal v. Cook County, Ill.*, 506 U.S. 56, 61-63, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992) (possessory interest subject to Fourth Amendment protection).

[17]*United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994); *United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir.), *cert. denied*, 469 U.S. 839 (1984); *State v. Clark*, 48 Wn. App. 850, 743 P.2d 822, *review denied*, 109 Wn.2d 1015 (1987); *see also State v. Dold*, 44 Wn. App. 519, 523, 722 P.2d 1353 (1986) ("[T]he burden is on the defendant to present evidence that indicates collusion between the citizen informant and the police").

[18]*United States v. Lyons*, 992 F.2d 1029, 1031 (10th Cir. 1993) (defendant must prove his standing to challenge a search); *see also Alderman v. United States*, 394 U.S. 165, 173, 89 S. Ct. 961, 22 L. Ed 2d 176 (1969) (*quoting Jones v. United States*, 362 U.S. 257, 261, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960) (one who brings a motion to suppress must allege and establish "that he himself was the victim of an invasion of privacy"); *cf. State v. Carter*, 127 Wn.2d 836, 850, 904 P.2d 290 (1995) (stating Washington's automatic standing rule).

[19]*Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) (exigent circumstances); *Arkansas v. Sanders*, 442 U.S. 753, 760, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), *overruled on other grounds in California v. Acevedo*, 500 U.S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991); *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S. Ct. 1969, 26 L. Ed. 2d 409 (1970); *United States v. Fike*, 82 F.3d 1315, 1323 (5th Cir. 1996); *Carhee*, 27 F.3d at 1496; *United States v. Iribe*, 11 F.3d 1553, 1556 (10th Cir. 1993) (government must prove valid consent); *United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir.) (government must prove exigency), *cert. denied*, 114 S. Ct. 639 (1993); *State v. Leach*, 113 Wn.2d 735, 738, 782 P.2d 1035 (1989); *State v. Mathe*, 102 Wn.2d 537, 540-41, 688 P.2d 859 (1984); *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980); *State v. Lopez*, 70 Wn. App. 259, 268, 856 P.2d 390 (1993), *review denied*, 123 Wn.2d 1002 (1994); *State v. Weaver*, 38 Wn. App. 17, 20, 683 P.2d 1136, *review denied*, 102 Wn.2d 1019 (1984); Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.2(b), at 218 (2d ed. 1987) ("[I]f the police acted without a warrant the burden of proof is on the prosecution").

the defendant must show a lack of justification for its actions.[20]

## A.

Here, the first question is whether, and when, the package was seized. This question determines whether, and when, the defendants were entitled to constitutional protection. Thus, it is a question on which the defendants bore the burden of proof.

■ Generally, a "seizure" of property occurs when " 'there is some meaningful interference with an individual's possessory interests in that property.' "[21] More specifically, a seizure of mail occurs when a package is detained or removed from the normal flow of delivery.[22] A seizure cannot occur, however, without governmental participation.[23]

The *Daniel* case illustrates these principles. There, the Fifth Circuit held that a seizure did not occur merely because an airline employee who was not acting on behalf of the government detained a package. Rather, the court said, a seizure occurred when a DEA agent took control over the package while waiting for a drug detection dog to arrive.[24] The seizure was justified because, when it occurred, the DEA agent had a reasonable suspicion of criminal activity.

---

[20]*Carhee*, 27 F.3d at 1496; *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980), *cert. denied*, 450 U.S. 934 (1981); *State v. Fisher*, 96 Wn.2d 962, 967, 639 P.2d 743, *cert. denied*, 457 U.S. 1137 (1982); *State v. Smith*, 39 Wn. App. 642, 648, 694 P.2d 660 (1984), *review denied*, 103 Wn.2d 1034 (1985); *Weaver*, 38 Wn. App. at 20; *State v. Rood*, 18 Wn. App. 740, 746 n.5, 573 P.2d 1325 (1977).

[21]*Soldal*, 506 U.S. at 61; *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).

[22]*See United States v. Banks*, 3 F.3d 399 (11th Cir. 1993) ("detention"), *cert. denied*, 114 S. Ct. 1097 (1994); *United States v. Daniel*, 982 F.2d 146, 150 (5th Cir. 1993) ("removing it from the normal flow of mail").

[23]*Burdeau v. McDowell*, 256 U.S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921); *Daniel*, 982 F.2d at 149 (citing *Jacobsen*, 466 U.S. at 113); *see also Soldal*, 506 U.S. at 67 n.11, 69.

[24]*Daniel*, 982 F.2d at 149.

██ ██ In this case, there was no seizure before Federal Express delivered the package to the sheriff's front counter. The trial court expressly found that, although Hamilton had expressed interest in the package, he had not directed or even requested that it be delivered to the sheriff's office. Because neither defendant has assigned error to this finding, it is a verity on appeal.[25] Even if it were not a verity, it is supported by the record; Hamilton testified he had not directed or requested Federal Express to deliver the package, and a rational trier of fact could have credited his testimony.[26]

Likewise, there was no seizure when Federal Express delivered the package to the sheriff's office. The package was delivered to a counter clerk, and there is no evidence that the counter clerk was authorized to make, or did make, a seizure. Hamilton was not present at the time of delivery, and there is no evidence that he or any other officer seized the package at that time.

██ Finally, there was a seizure when Hamilton arrived at the sheriff's office about 11:30 a.m., took control of the package, and began to arrange for a drug dog to be brought in. At that point, for the first time according to the trial court's findings, Hamilton meaningfully interfered with the Jacksons' possessory interest in the package, and there was a governmental seizure.

## B.

The next questions are whether the seizure of the package was justified (1) when it occurred and (2) in duration.

---

[25]*State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

[26]In making this statement, we use the substantial evidence standard set forth in *State v. Hill*, 123 Wn.2d at 647. We note *Ornelas v. United States*, 517 U.S. 690, 116 S. Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996), in which the United States Supreme Court held "that as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." *Ornelas* does not alter our discussion because (a) the question here is when a seizure occurred; (b) *Ornelas* was a federal supervisory case, as opposed to a constitutional case; and (c) even if we were to apply *Ornelas*, we would reach the same result.

Because the seizure was without warrant, the State bore the burden of proof on these questions.

■■ A temporary seizure of mail is initially justified if the authorities have a reasonable and articulable suspicion of criminal activity.[27] Although "temporary," it can last for a number of hours if that length of time is reasonable under the circumstances.[28] Thus, the United States Supreme Court has described its own holdings as follows:

In two instances, the Court has allowed temporary seizures and limited detentions of property based upon less than probable cause. In *United States v. Van Leeuwen*, 397 U.S. 249 [, 90 S. Ct. 1029, 25 L. Ed. 2d 82] (1970), the Court refused to invalidate the seizure and detention—on the basis of only reasonable suspicion—of two packages delivered to a United States Post Office for mailing. One of the packages was detained on mere suspicion for only 1 1/2 hours; by the end of that period enough information had been obtained to establish probable cause that the packages contained stolen coins. But the other package was detained for 29 hours before a search warrant was finally served. Both seizures were held reasonable. In fact, the Court suggested that both seizures and detentions for these "limited times" were "prudent" under the circumstances.[29]

Once an investigative detention ripens into probable cause to search, the State can detain the property for the time reasonably needed to prepare and secure a search warrant.[30]

---

[27]*United States v. Van Leeuwen*, 397 U.S. 249, 252-53, 90 S. Ct. 1029, 25 L. Ed. 2d 282 (1970); *Banks*, 3 F.3d 399, 401; *United States v. Lux*, 905 F.2d 1379, 1381, 115 A.L.R. Fed. 749 (10th Cir. 1990); *United States v. Aldaz*, 921 F.2d 227, 229 (9th Cir. 1990), *cert. denied*, 501 U.S. 1207 (1991); *United States v. Mayomi*, 873 F.2d 1049, 1053 (7th Cir. 1989); *see also Segura v. United States*, 468 U.S. 796, 806 n.6, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) (discussing *Van Leeuwen*).

[28]This assumes that the detention of a person is not involved. *See United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (90 minutes too long where detention of person involved).

[29]*Segura*, 468 U.S. at 806 n.6.

[30]*Sanders*, 442 U.S. 753 (1979) (luggage); *Van Leeuwen*, 397 U.S. 249 (1970) (packages in mail); *Segura*, 468 U.S. 796 (1984) (house); *Chambers v. Maroney*,

Here, the State has shown that Hamilton's initial seizure of the package was justified. Hamilton had received, through Chief Stoutt, an informant's tip that James Jackson, who lived at 151 Cowlitz Gardens, #11, was obtaining drugs weekly by Federal Express. Although Hamilton did not have the informant's name, he knew that Chief Stoutt did, and he knew, through Chief Stoutt, that information from the informant had previously led to felony arrests.[31] Hamilton independently verified Jackson's address, the fact that Federal Express had been delivering packages to Jackson approximately weekly, and the fact that Federal Express presently possessed a package addressed to Jackson. Based on this information, Hamilton had a reasonable and articulable suspicion of criminal activity when he initially seized the package.

The State has also shown that it detained the package for only a few minutes before acquiring probable cause to search. Generally, an "alert" by a trained drug dog is sufficient to establish probable cause for the presence of a controlled substance.[32] Here, the dog's training and track record were known to the police on the scene and were

399 U.S. 42, 51, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970) (car); *Texas v. White*, 423 U.S. 67, 96 S. Ct. 304, 46 L. Ed. 2d 209 (1975) (car); *Michigan v. Thomas*, 458 U.S. 259, 102 S. Ct. 3079, 73 L. Ed. 2d 750 (1982); *State v. Terravona*, 105 Wn.2d 632, 645, 716 P.2d 295 (1986) (house); *State v. Ng*, 104 Wn.2d 763, 770-71, 713 P.2d 63 (1985) (house); *State v. Huff*, 64 Wn. App. 641, 653, 826 P.2d 698 (car), *review denied*, 119 Wn.2d 1007 (1992).

[31]*See Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) (informant's tip generated reasonable suspicion where informant was known to officer and had supplied information in past).

[32]*United States v. Williams*, 69 F.3d 27, 28 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1284 (1996); *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994); *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993); *Banks*, 3 F.3d at 402; *United States v. Knox*, 839 F.2d 285, 293 n.4 (6th Cir. 1988), *cert. denied*, 490 U.S. 1019 (1989); *see also Florida v. Royer*, 460 U.S. 491, 506, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) ("a positive result [by a trained narcotics dog] would have resulted in his justifiable arrest on probable cause"); *State v. Stanphill*, 53 Wn. App. 623, 632, 769 P.2d 861 (1989) (provided that the dog's training and reliability are known to the decision-maker); *Ludwig*, 10 F.3d at 1528 ("A dog alert might not give probable cause if the particular dog had a poor accuracy record, but the evidence shows that the dog in this case has never falsely alerted"); *Diaz*, 25 F.3d at 394 ("For a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established"); *United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993) ("A canine sniff

subsequently shown in the affidavit submitted to obtain a search warrant. Thus, the State had probable cause to search the package after the dog alerted, which, according to Hamilton, was about 11:45 a.m.

Because only a few minutes elapsed between Hamilton's initial seizure of the package and his acquisition of probable cause to search, the duration of the temporary investigative seizure was plainly reasonable. Moreover, once Hamilton had probable cause to search, he did not detain the package for longer than the time reasonably needed to prepare and secure a warrant. It follows that the seizure and detention of the package were lawful.

### C.

The Jacksons do not contend that if the seizure and detention of the package were otherwise lawful, the search warrants for the package and house were unsupported by probable cause. Accordingly, the trial court did not err by denying the motions to suppress.

### II.

■ We turn to the *Knapstad* issue. In a criminal case, a defendant may challenge the sufficiency of the evidence (a) before trial,[33] (b) at the end of the State's case in chief,[34] (c) at the end of all the evidence,[35] (d) after

---

alone can supply probable cause necessary for issuing search warrant if the application for the warrant establishes the dog's reliability"); *United States v. Florez*, 871 F. Supp. 1411, 1423 (Dist. N.M. 1994) (when a dog's detection accuracy is credibly challenged, evidence of the dog alerting is insufficient to establish probable cause absent documentation of the dog's accuracy rate, or corroborating evidence of the presence of drugs); *but see Williams*, 69 F.3d at 28; *Daniel*, 982 F.2d 146.

[33]*Knapstad*, 107 Wn.2d 346, 356-57, 729 P.2d 48 (1986).

[34]*See State v. Sunset Quarries, Inc.*, 66 Wn.2d 700, 701, 404 P.2d 786 (1965); *Sherry v. Diercks*, 29 Wn. App. 433, 442, 628 P.2d 1336, *review denied*, 96 Wn.2d 1003 (1981); *State v. McKeown*, 23 Wn. App. 582, 588, 596 P.2d 1100 (1979).

[35]*See State v. Brown*, 55 Wn. App. 738, 742, 780 P.2d 880 (1989) (defendant moved for dismissal at close of State's case and again at close of the evidence), *review denied*, 114 Wn.2d 1014 (1990).

verdict,[36] and(e) on appeal.[37] In each instance, the court takes the evidence and the reasonable inferences therefrom in the light most favorable to the State.[38]

Before trial, a court examines sufficiency based on facts supplied by affidavit. At the end of the State's case in chief, a court examines sufficiency based on the evidence admitted at trial so far. At the end of all the evidence, after verdict, or on appeal, a court examines sufficiency based on all the evidence admitted at trial.[39] Each succeeding basis is more complete, and hence better, than the one before.

Regardless of when a court is asked to examine the sufficiency of the evidence, it will do so using the best factual basis then available. For this reason, a defendant who presents a defense case in chief "waives" (i.e., may not appeal) the denial of a motion to dismiss made at the end of the State's case in chief,[40] and a defendant who goes to trial may not appeal the denial of a *Knapstad* motion.[41] This does not mean that a defendant is barred from claiming insufficiency at a late stage of the proceedings, merely

---

[36]CrR 7.4(a)(3).

[37]*State v. Baeza*, 100 Wn.2d 487, 488, 670 P.2d 646 (1983); *State v. Chavez*, 65 Wn. App. 602, 605, 829 P.2d 1118 (1992); *State v. Young*, 50 Wn. App. 107, 111, 747 P.2d 486 (1987).

[38]*Jackson v. Virginia* 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

[39]*Chavez*, 65 Wn. App. at 605; *Young*, 50 Wn. App at 111.

[40]*State v. Allan*, 88 Wn.2d 394, 396, 562 P.2d 632 (1977); *Goodman v. Bethel Sch. Dist. 403*, 84 Wn.2d 120, 123, 524 P.2d 918 (1974); *State v. Wilson*, 74 Wn.2d 243, 244-47, 444 P.2d 141 (1968), *cert. denied*, 395 U.S. 903 (1969); *Chavez*, 65 Wn. App. at 605; *Carle v. McChord Credit Union*, 65 Wn. App. 93, 97 n.3, 827 P.2d 1070 (1992); *Young*, 50 Wn. App. at 111.

[41]*State v. Olson*, 73 Wn. App. 348, 357 n.6, 869 P.2d 110 (citing *State v. Zakel*, 61 Wn. App. 805, 811 n.3, 812 P.2d 512 (1991), *aff'd on other grounds*, 119 Wn.2d 563, 834 P.2d 1046 (1992)), *review denied*, 124 Wn.2d 1029 (1994). The same reasoning applies in civil cases, as the Supreme Court recently noted.

When a trial court denies summary judgment due to factual disputes, as here, and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial, not from the denial of summary judgment.

because he or she failed to do so earlier;[42] it does mean, however, that the claim will be analyzed using the most complete factual basis available at the time the claim is made.[43]

Here, Helen Jackson went to trial, and the stipulations she made at trial were sufficient to prove each element of the crime charged. She has no right to have us review the sufficiency of the evidence using pretrial *Knapstad* affidavits. We conclude that she is not entitled to relief.[44]

Affirmed.

SEINFELD, C.J., and HOUGHTON, J., concur.

Motions for reconsideration denied July 29 and August 23, 1996.

Review denied at 131 Wn.2d 1006 (1997).

---

*Adcox v. Children's Orthopedic Hosp. and Medical Ctr.*, 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993) (citing *Johnson v. Rothstein*, 52 Wn. App. 303, 306, 759 P.2d 471 (1988)).

[42]*Baeza*, 100 Wn.2d at 488; *Chavez*, 65 Wn. App. at 605; *Young*, 50 Wn. App at 111.

[43]Nothing we say here means that parties cannot stipulate that the trial court should consider, as facts established at trial, facts set forth in *Knapstad* affidavits. *See Olson*, 73 Wn. App. at 353-54. When the parties in this case stipulated to facts at trial, however, they made no attempt to incorporate, or even refer to, the contents of any *Knapstad* affidavit.

[44]Even if we were to backtrack and consider the pretrial affidavits submitted in connection with the *Knapstad* motion, we would reach the same result. The evidence described in those affidavits is sufficient to support each element of the crime charged.